## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHERINE ANDERSON and IAN CALLAGHAN-KENNA, on behalf of themselves and all others similarly situated, | ) ) ) ) | Case No.: |
| Plaintiffs, | ) ) | CLASS ACTION COMPLAINT |
| v. | ) ) | |
| THE UNIVERSITY OF THE ARTS, | ) ) | **DEMAND FOR JURY TRIAL** |
| Defendant. | ) ) ) | |

Plaintiffs Katherine Anderson and Ian Callaghan-Kenna, individually, and on behalf of all others similarly situated, by and through their counsel, bring this action against The University of the Arts. Plaintiffs' allegations herein are based upon personal knowledge and belief as to their own acts, upon the investigation of their counsel, and upon information and belief as to all other matters.

## **INTRODUCTION**

1.      Plaintiffs bring this action individually and on behalf of a class of similarly situated students at The University of the Arts.

2.      Defendant The University of the Arts ("UArts" or "University") is a private university located in Philadelphia, Pennsylvania. It offers a variety of unique educational programs to students; for example, UArts is one of only eight universities in the nation to offer Bachelor of Music degrees.[1]

3.      Students from more than 40 states and nearly 20 countries relocate to Philadelphia to take advantage of the high-caliber, selective, and highly sought degree programs at UArts.

---

[1] https://catalogue.uarts.edu/content.php?catoid=26&navoid=6022 (last visited June 10, 2024)

4.      On the evening of May 31, 2024, University President Kerry Walk announced that, after nearly 150 years, the University would be closing its doors permanently on June 7, 2024. The shocking and unprecedented announcement provided students and staff with only a week's notice, and the announcement did little to address the myriad of concerns the student body had about their educational and career futures.

5.      The closure of the University was foreseeable to the University, and obviously was deliberated about and forecasted substantially in advance of the public announcement, and yet the University failed to provide reasonable notice to its students, faculty, and staff.

6.      After learning of the abrupt closure, Plaintiffs and other similarly situated students have been left displaced, stranded, confused, and abandoned by the University. Instead of offering clear guidance or any effective plan for navigating the sudden and unexpected transition, the University has shirked its responsibilities entirely.

7.      Accordingly, Plaintiffs, on behalf of themselves and all other students currently enrolled at the University, bring this action for breach of contract, breach of implied contract, unjust enrichment, fraud, and for violations of the Pennsylvania consumer protection statute, in order to recover the amounts paid to the University for degree programs that UArts failed to provide and for the University's failure to uphold its stated and implied commitments to its students.

## PARTIES

**Plaintiff Katherine Anderson**

8.      Plaintiff Katherine Anderson is citizen of Texas and currently resides in Austin, Texas.

9. Plaintiff was enrolled in the music business, entrepreneurship, and technology program at UArts and was scheduled to begin her second year at UArts when announcement of the closure was made.

10. UArts was Plaintiff's dream school. While she applied to another school as a "safety net," Plaintiff did not want to attend any other university because she loved the culture, community, and access to highly successful faculty and support staff that UArts offered. Further, UArts boasted its job placement and success that Plaintiff would achieve post-graduation.

11. Plaintiff was further drawn to UArts because the program is the only one of its kind in the nation. Further, UArts boasts that it is ranked #2 among music schools.[2] Indeed UArts touts its "top-ranked" degree program:[3]

> The school trains you to be a professional of the highest caliber through a comprehensive curriculum that includes private lessons with an actively performing faculty, an abundance and diversity of ensembles and performance experiences, and a focus on information literacy and critical thinking.

12. UArts offered Plaintiff a sizable scholarship to attend the university. Because of these reasons, Plaintiff decided to enroll in UArts beginning in the fall of 2023. At the time of her enrollment, she believed he would be able to complete her program within three years.

13. Due to numerous communications and representations by UArts, Plaintiff expected to take classes during the 2024-2025 academic year. UArts encouraged her to apply for federal financial aid for the 2024-2025 academic year via the Free Application for Federal Student Aid ("FAFSA") by March 15, 2024;[4] UArts instructed her to register for fall 2024 classes as early as

---

[2] https://www.uarts.edu/academics/undergraduate/music-business-entrepreneurship-and-technology-bs (last visited June 12, 2024)
[3] *Id.*
[4] https://www.uarts.edu/finaid/undergrad/2024-2025-finaid (last visited June 10, 2024)

April 2024;[5] UArts issued Plaintiff's bill for the fall 2024 semester in May 2024;[6] and set the deadline to apply for housing for the 2024-2025 academic year in April 2024.[7] Indeed, Plaintiff had lived in the university's housing for the 2023-2024 academic year and had planned to live on campus for the 2024-2025 academic year.

14.     Plaintiff expended considerable effort, time, and money to attend UArts. Indeed, she relocated from Austin, Texas to attend UArts.

15.     Plaintiff has lost valuable opportunities as a result of the closure of UArts and must now refocus her effort, time, and money towards developing a transition plan. Specifically, Plaintiff has lost access to state of the art facilities, including recording studios and performance spaces, highly sought employment and internship opportunities through UArts, networking with stellar faculty and staff, and more.

16.     Plaintiff reasonably relied on the continuing operation of UArts when choosing to attend the University.

17.     Plaintiff also reasonably relied on UArts' accreditation status when choosing to attend. Had UArts not been accredited or lost its accreditation status, Plaintiff would not have enrolled, or would have paid substantially less for tuition to attend UArts.

18.     UArts' closure has created difficulties for achievement of Plaintiff's continuing educational and career goals. For example, Plaintiff has been unable to find an equivalent program school to the music, business, entrepreneurship, and technology program at UArts. Further, the alternative school options Plaintiff is considering are not of the same caliber as UArts, which will

---

[5] https://www.uarts.edu/calendar (last visited June 10, 2024)
[6] *See id.*
[7] https://www.uarts.edu/life-at-uarts/housing (last visited June 10, 2024)

put Plaintiff at an academic disadvantage had UArts not closed. Further, Plaintiff may not be able to obtain the same scholarship at the one she had at UArts.

19.     Further, UArts has not provided Plaintiff with any information on how to best transfer her credits to another school, how to audition for other schools, or how much longer her degree will take.

20.     The majority of housing at an alternative school Plaintiff is considering has already been reserved. Thus, Plaintiff does not know where she will be able to live should she transfer to another school.

**Plaintiff Ian Callaghan-Kenna**

21.     Plaintiff Ian Callaghan-Kenna is citizen of Pennsylvania and currently resides in Philadelphia, Pennsylvania.

22.     Plaintiff was a film major at UArts and was scheduled to begin his second year at UArts when announcement of the closure was made.

23.     Prior to attending UArts, Plaintiff applied to two other schools. After speaking with the film department at UArts, UArts became his first choice school. The film industry is "competitive," and UArts promises its students that [it will] prepare [them] for this competitive industry."[8]

24.     Plaintiff was drawn to UArts in part due to its film program and access to high quality equipment. UArts touts its program as:

> An Unmatched, Well-Rounded Education. This four-year Film degree program offers a behind-the-camera experience unlike any other. Our unique, interdisciplinary courses give you the opportunity to collaborate with students across the university, including actors, screenwriters, composers and other student artists. You can also choose to major in one of our unique hybrid majors, such as Film and Animation or Film Design.[9]

---

[8] https://www.uarts.edu/academics/undergraduate/film-bfa (last visited June 10, 2024)
[9] https://www.uarts.edu/academics/undergraduate/film-bfa (last visited June 10, 2024)

25.     Plaintiff was also drawn to UArts because of the support offered by faculty and staff. UArts offered Plaintiff a sizable scholarship to attend the university. Because of these reasons, Plaintiff decided to enroll in UArts beginning in the fall of 2023. At the time of his enrollment, he believed he would be able to complete a Bachelor of Fine Arts in Film by May of 2027.

26.     Due to numerous communications and representations by UArts, Plaintiff expected to take classes during the 2024-2025 academic year. UArts encouraged him to apply for federal financial aid for the 2024-2025 academic year via the Free Application for Federal Student Aid ("FAFSA") by March 15, 2024;[10] UArts instructed him to register for fall 2024 classes as early as April 2024;[11] UArts issued Plaintiff's bill for the fall 2024 semester in May 2024;[12] and set the deadline to apply for housing for the 2024-2025 academic year in April 2024.[13]

27.     Additionally, Plaintiff's federal loans were sent to UArts for the 2024-2025 academic year prior to UArts announcing that it would close on June 7, 2024. As a result, Plaintiff is unsure, and UArts has failed to inform Plaintiff, whether the federal loans will be returned to Plaintiff so he can attend another college or university, or whether UArts will retain Plaintiff's funds.

28.     Plaintiff expended considerable effort, time, and money to attend UArts.

29.     Plaintiff has lost valuable opportunities as a result of the closure of UArts and must now refocus his effort, time, and money towards developing a transition plan. Specifically,

---

[10] https://www.uarts.edu/finaid/undergrad/2024-2025-finaid (last visited June 10, 2024)
[11] https://www.uarts.edu/calendar (last visited June 10, 2024)
[12] *See id.*
[13] https://www.uarts.edu/life-at-uarts/housing (last visited June 10, 2024)

Plaintiff has lost access to high quality film equipment, employment and internship opportunities through UArts, networking with faculty and staff, and more.

30.     Plaintiff reasonably relied on the continuing operation of UArts when choosing to attend the University.

31.     Plaintiff also reasonably relied on UArts' accreditation status when choosing to attend. Had UArts not been accredited or lost its accreditation status, Plaintiff would not have enrolled, or would have paid substantially less for tuition to attend UArts.

32.     UArts' closure has created difficulties for achievement of Plaintiff's continuing educational and career goals. For example, Plaintiff has been unable to find an equivalent film school that will accept the credits he took at UArts. Further, the alternative school options Plaintiff is considering are not of the same caliber as UArts, which will put Plaintiff at an academic disadvantage had UArts not closed. Further, due to the unexpected closure, Plaintiff may not be able to gather the necessary funds to begin school at another university for the fall 2024 semester. Indeed, other universities have not offered to match the scholarship UArts provided to Plaintiff.

33.     Further, UArts has not provided Plaintiff with any information on how to best transfer his credits to another school, how to audition for other schools, or ensured that the funds Plaintiff paid to UArts for the upcoming year will be refunded to him.

34.     A substantial number of transfer application deadlines at other colleges and universities have already passed, thus Plaintiff may be unable to continue his education for the 2024-2025 academic year.

**Defendant**

35.     Defendant The University of the Arts is a private university located in Philadelphia, Pennsylvania. It is registered as a Pennsylvania corporation located at 320 South Broad Street,

Philadelphia, Pennsylvania 19102. At this location, the University maintains its administrative offices, along with residence halls, the student center, and Terra Hall, which houses the University's classrooms and main dining location.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiffs and Defendant are citizens of different States.

37.     This Court has personal jurisdiction over the University because it was formed under the laws of the State of Pennsylvania, it is located in Philadelphia, Pennsylvania, it conducts substantial business in the District, and a substantial part of the acts and omissions complained of occurred in the District.

38.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the University is located in this district, transacts business in this district, is subject to personal jurisdiction in this district, and is therefore deemed to be a citizen of this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

**The University of the Arts**

39.     The University of the Arts ("UArts" or "University") was established in 1876 "by the merging of two century-old institutions: Philadelphia College of Art and Philadelphia College of the Performing Arts."[14] UArts was granted university status in 1987 and has since become "the

---

[14] https://www.uarts.edu/about (last visited June 12, 2024)

largest institution of its kind in the nation, offering programs in design, fine arts, media arts, crafts, music, dance, theater and writing."[15]

40.     After nearly 150 years, UArts proclaims to be "at the heart of everything artistic and cultural in Philly"[16] and has over 19,000 living alumni, including several Grammy- and Tony-award winning artists.

41.     UArts offers an educational experience that cannot be replicated at any other college or university. UArts boasts that "we're the only arts school in America that makes it possible to work and collaborate across traditional boundaries."[17] (emphasis added). It further touts its unique programs:[18]

> As one of the nation's only comprehensive arts universities, University of the Arts offers a unique environment in which students from many disciplines—artists, performers, writers and media makers—interact in a dynamic, collaborative community of creativity.

42.     UArts also offers highly sought degree programs, including one of eight Bachelor of Music degrees nationwide.

43.     UArts further marketed itself as a stable and reliable institution, able to remain financially stable and produce positive outcomes for its students, faculty, and staff. Indeed, UArts states the following about the "UArts Brand" in its Brand Identity Guidelines: "By presenting our brand consistently, we can positively influence how people think and feel about UArts. And that means we can amplify our potential impact, whether by recruiting more high-achieving students and top faculty or raising more money to support programs and student scholarships."[19]

---

[15] *Id.*
[16] *Id.*
[17] https://www.uarts.edu/about (last visited June 10, 2024)
[18] https://www.uarts.edu/about/quick-facts (last visited June 10, 2024)
[19] https://uarts.getbynder.com/m/615fe9a4c9519459/original/2021-Brand-Identity-Guidelines.pdf (last visited June 10, 2024)

44.     Approximately 1,300 undergraduate and graduate students attend UArts each year across six schools: the School of Art, the School of Dance, the School of Design, the School of Film, the School of Music, and the Ira Brind School of Theater Arts. The University also offers graduate and professional studies and a Doctoral program.

45.     The University houses twenty-one bachelor's degree programs through which students may receive Bachelor of Fine Arts, Bachelor of Music, and Bachelor of Science degrees. The University also offers a broad selection of minors and studio concentration areas.

46.     The University houses twelve master's degree programs through which students may receive Master of Arts, Master of Arts in Teaching, Master of Education, Master of Fine Arts, Master of Design, and Master of Music degrees. The University also offers two fifth-year capstone Master's in Teaching programs.

47.     Because of UArts' unique educational offerings, students have moved, or planned to move, to Philadelphia to attend the University from approximately 40 different states and 18 countries.[20]

48.     In the 2023-2024 academic year, undergraduate tuition at UArts was $54,010. In addition, the University charged students a Student Services Fee of $280. When combined, total direct costs for undergraduate students equaled $54,290.[21]

49.     Tuition was set to increase to $55,630 for the 2024-2025 academic year, and the Student Services Fee was set to increase to $290. When combined, total direct costs for undergraduate students were $55,920, a 3% increase from the previous year.[22]

---

[20] https://www.uarts.edu/about/quick-facts (last visited June 7, 2024)
[21] https://www.uarts.edu/finaid/undergrad/costs (last visited June 10, 2024)
[22] *Id.*

50.     Graduate tuition for the 2024-2025 academic year was set to start at $55,630 and increase for certain programs.[23] The Student Services Fee was set at $290. When combined, total direct costs for graduate students were $55,920 or more.[24]

51.     Students planning to enroll in the University for the upcoming 2024-2025 academic year were required to submit tuition deposits, which were to be later credited towards tuition, in order to hold their spot at UArts.

52.     The University offers housing in three on-campus residence halls, with costs in the 2023-2024 academic year ranging from $12,782 per year for a shared room within an apartment to $13,782 for a single studio apartment. The University requires a nonrefundable annual housing reservation deposit of $200, and an annual security deposit of $200.[25]

53.     Many students at the University elect to live in off-campus housing. To secure off-campus housing in advance of the academic year, nearly all students are required to supply their respective landlords with a security deposit and/or prepayment of rent.

54.     As of May 31, 2024, the University was accepting applications for admissions and allowing students to enroll for the 2024-2025 academic year.

55.     As of May 31, 2024, the University was accredited by the Middle States Commission on Higher Education ("MSCHE"), an accrediting institution recognized by the U.S. Department of Education, and the National Association of Schools of Music, the principal accreditor for higher education in music in the United States.

---

[23] https://www.uarts.edu/finaid/grad/graduate-cost-attendance (last visited June 10, 2024)
[24] *See id.*
[25] https://www.uarts.edu/finaid/undergrad/costs (last visited June 10, 2024)

56.    MSCHE has specific standards that institutions must meet to be accredited. Those standards include:[26]

[H]onesty and truthfulness in public relations announcements, advertisements, recruiting and admissions materials and practices, as well as in internal communications;

…

compliance with all applicable government laws and regulations and Commission policies and procedures, including but not limited to:

    a.    required information for students and the public;

    b.    representation of accreditation status;

    c.    full disclosure of information on institution-wide assessments, graduation, retention, certification and licensure or licensing board pass rates;

    d.    institution's compliance with the Commission's Requirements of Affiliation;

    e.    verification of student identity in distance and correspondence education;

    f.    substantive changes affecting institutional mission, goals, programs, operations, sites, and other material issues which must be disclosed in a timely and accurate fashion;

. . .

clearly documented and communicated planning and improvement processes that provide for inclusive constituent participation;

. . .

a financial planning and budgeting process that is aligned with the institution's mission and goals, evidence-based, and clearly linked to the institution's and units' strategic plans/objectives;

. . .

documented financial resources, funding base, and plans for financial development, including those from any related entities adequate to support its educational purposes and programs and to ensure financial stability;

. . .

a record of responsible fiscal management, including preparing a multi-year budget and an annual independent audit confirming financial viability and proper internal financial

---

[26]   https://www.msche.org/standards/fourteenth-edition/ (last visited June 7, 2024)

controls, with evidence of corrective measures taken to address any material findings cited in the audit or an accompanying management letter;

. . .

strategies to measure and assess the adequacy and efficient utilization of institutional resources required to support the institution's mission and goals; and

. . .

periodic assessment of the effectiveness of planning, resource allocation, institutional renewal processes, and availability of resources.

57.     An important factor for students when choosing to enroll in a college or university is accreditation by a reputable accreditation institution.

**The University's Closure**

58.     On Friday, May 31, 2024, an article in The Philadelphia Inquirer revealed that UArts would be closing its doors permanently just one week later on Friday, June 7, 2024. An official announcement confirming the decision was sent directly to students, faculty, and staff hours later by Kerry Walk, University President, and Judson Aaron, Chair of the Board of Trustees.

59.     UArts attributed the abrupt closure to its "fragile financial state" and "many years of declining enrollments, declining revenues, and increasing expenses."[27] The University did not elaborate any further on the reasons prompting the closure, including how long UArts was aware of declining financial performance, nor did it offer any explanation for the unprecedented lack of reasonable notice.

60.     The statement invited students, faculty, and staff to town hall meetings, stating: "We are committed to providing a space for your questions and concerns."[28] UArts did not provide any further details outlining a transition plan for students currently enrolled, leaving its students in the dark about their future.

---

[27] https://www.uarts.edu/closing (last visited June 6, 2024)
[28] *Id.*

61.     Prior to the statement, on May 29, the University had informed the Middle States Commission on Higher Education of its anticipated closure. Students and faculty were not given a similar warning that a closure was imminent.

62.     On May 31, the Commission released a statement stating that it had taken immediate action to withdraw the University's accreditation effective June 1, 2024.[29]

63.     Pennsylvania law requires that the State Board of Private Licensed Schools be notified 30 days in advance if a school intends to close. 22 Pa. Code § 73.95(a). Plaintiffs and the Class members are not aware of compliance with this requirement because students and faculty were not given a similar warning that a closure was imminent.

64.     On June 1, the Board of Trustees met and voted to approve the decision to close the University. On June 2, the Trustees released its first statement on the closure, confirming the formal vote and committing the University to "supporting [its] students, faculty, and staff through this heartbreaking transition."[30] The Trustees did not elaborate any further on the reasons prompting the closure or provide any details outlining a transition plan for students currently enrolled.

65.     On June 3, the University abandoned its promise to host town hall meetings by canceling a scheduled town hall via e-mail minutes before it was supposed to start. The University explained the cancellation by stating that it could not adequately answer questions at that time, again leaving its students in the dark about their futures.

---

[29] https://www.uarts.edu/about/accreditation (last visited June 10, 2024)
[30] *Id.*

66.     On June 4, Kerry Walk resigned as University president. In response, the Board of Trustees released a second statement, announcing that the University had engaged management firm Alvarez & Marshal to "urgently address the needs of [its] students, faculty, and staff."[31]

67.     Other academic institutions that have permanently closed their doors announced the decision weeks, if not months, in advance, and have offered clear transition plans for students, faculty, and staff.[32]

68.     The closure was foreseeable to the University and its leadership, yet UArts failed to provide reasonable notice to students, faculty, and staff. Despite this, UArts continued to admit students to the University, enroll students in various degree programs and courses, and collect tuition, room and board, and other fees from students.

69.     The University has avoided its responsibilities by failing to offer a clear transition plan.

70.     Plaintiffs and other similarly situated students at UArts have been left with uncertainty about their academic futures and have experienced severe financial hardship from the unprecedented closure and lack of reasonable notice.

71.     With only a week's notice, students planning to attend the University in the 2024-2025 academic year have been forced to quickly navigate the transition with little to no guidance from UArts.

72.     Students have been forced to pause their summer commitments and obligations to order transcripts, obtain important financial information from the University, and find alternative housing, with many sacrificing deposits on apartments.

---

[31] *Id.*
[32] *See, e.g.*, https://www.wells.edu/announcement-of-closure/ (April 29, 2024 announcement of closure effective June 30, 2024)

73.     Many students have been forced to apply and/or audition for analogous programs at other schools, if analogous programs are even available at other institutions. The short notice provided by UArts has forced students to quickly prepare application and audition materials. In addition, students are now forced to unexpectedly pay for another round of submitted applications. In many instances, application and acceptance deadlines have already passed for the 2024-2025 academic year. Further, UArts has provided no guidance on the transferability of credits taken at UArts to other institutions around the country, potentially causing Plaintiffs and the Class to re-do years of schooling already completed, or to forego their plans of obtaining a degree at all.

74.     Students enrolled in the health insurance plan obtained through UArts have lost coverage as a result of the closure. As a result, students have been forced to quickly search for alternative insurance. However, given enrollment timelines for many health insurance plans, coverage will not start for many students until July 1, 2024. Typically, if an individual enrolls in a health insurance plan between May 16 and June 15, coverage will not begin until July 1.[33] As a result, many students will be left uninsured for at least a month.

75.     Additionally, students housed in the University's residence halls have been displaced. As a result, students are at risk of homelessness and/or are forced to spend substantial expenses to obtain alternative housing.

## **CLASS ALLEGATIONS**

76.     Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

**Nationwide Class:**

---

[33] *See, e.g.*, https://company.getinsured.com/coverage-start-date-explained/#:~:text=Here%27s%20a%20simple%20explanation%20of,day%20of%20the%20next%20month. (last visited June 10, 2024)

All persons in the United States accepted to and/or enrolled at The University of the Arts for the 2024-2025 academic year.

77.     Alternatively, Plaintiff Anderson brings this action on behalf of a Texas Class and Plaintiff Callaghan-Kenna brings this action on behalf of a Pennsylvania Class. Together, State Classes and/or Nationwide Class is referred to herein as the Class. Excluded from the Class(es) are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

78.     **Numerosity:** Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process. Plaintiffs believe, and on that basis allege, that the Class consists of over a thousand students. The number and identity of Class members can be determined based on the University's records.

79.     **Commonality:** Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.   When UArts first learned that its financial status would require the permanent closure of UArts;

    b.   When UArts was obligated to disclose that it would be permanently closing;

    c.   Whether UArts breached its contracts with Plaintiffs and the Class;

    d.   Whether UArts breached its implied contracts with Plaintiffs and the Class;

    e.   Whether UArts violated state consumer protection laws;

     f.   Whether UArts has been unjustly enriched by Plaintiffs and the Class; and

     g.   Whether UArts knowingly misled Plaintiffs and the Class.

80.    Typicality: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs and Class members' claims all arise out of UArts' uniform conduct and statements.

81.    **Adequacy:** Plaintiffs have no interest that conflicts with the interests of the Class, and is committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

82.    **Superiority:** A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by UArts' conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

<div align="center">

**CAUSES OF ACTION**
**COUNT I**
**BREACH OF CONTRACT**
**(on behalf of Plaintiffs and the Class)**

</div>

83.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

84.     Plaintiffs and the Class members entered into a contract with Defendant when they enrolled in UArts.

85.     The contract required that the University provide Plaintiffs and the Class with their respective educational programs and degree offerings.

86.     The contract further required that the Defendant follow state regulations, remain accredited, and meet accreditation standards, including by remaining financially stable, providing reasonable notice to students, faculty, and staff of an impending closure, and promptly developing a clear transition plan in the event of a closure.

87.     Defendant's obligations under the contract were intended to benefit Plaintiffs and the Class members.

88.     Plaintiffs and the Class members reasonably relied on Defendant's ability to perform according to its obligations when they enrolled in the University.

89.     Defendant's obligations were material to Plaintiffs' and the Class members' decisions to enroll in the University because a reasonable person would have considered them to be important in deciding whether to enroll.

90.     Plaintiffs and the Class members paid tuition or tuition deposits to Defendant, declined employment and/or enrollment at other universities, and moved to Philadelphia in order to attend UArts and obtain the benefits guaranteed under the contract.

91.     Defendant breached its contracts with Plaintiffs and the Class when it failed to provide the educational degree programs in which Plaintiffs and the Class were enrolled.

92.     Defendant breached the contract when it failed to provide reasonable notice to students, faculty, and staff of its financial instability and impending closure.

93.     Defendant further breached the contract when it failed to meet accreditation standards.

94.     Defendant further breached the contract when it failed to follow state regulations pertaining to its closure.

95.     Defendant further breached the contract when it failed to provide a clear transition plan, leaving students stranded, confused and abandoned, and placing the educational and career goals of Plaintiffs and the Class members in jeopardy.

96.     Defendant's breach of the contract directly injured Plaintiffs and the Class members, who spent considerable effort, time, and money to attend UArts and are now forced to spend additional effort, time, and money to make alternate arrangements.

97.     Plaintiffs and the Class members paid tuition or tuition deposits, turned down other opportunities, and complied with all other obligations under the contract, but did not receive the promised benefits in return.

98.     Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and the Class members, thereby entitling Plaintiffs and the Class members to punitive damages.

99.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(on behalf of Plaintiffs and the Class)**

100.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

101.     Plaintiffs and the Class members entered into a contract with Defendant when they enrolled in UArts.

102.     Implied in the contract is a covenant of good faith and fair dealing, which requires that the parties execute their obligations under the contract with due care and consideration for the other parties to the contract.

103.     Implied in the contract is an agreement to comply with all relevant laws and regulations.

104.     Implied in the contract is an agreement to do and perform whatever is necessary to accomplish the purpose of the contract and to refrain from doing anything that injures another party's right to receive the benefits of the contract.

105.     The contract was implied by the parties' conduct, including Defendant's representations that the University was a stable and reliable institution, able to remain financially stable and produce positive outcomes for its students, faculty, and staff, and that UArts would be open for the 2024-2025 academic year.

106.     The contract was also implied by enrollment by Plaintiffs and the Class members and their payment of tuition and tuition deposits in reliance on Defendant's representations.

107.     Defendant's implied obligations under the contract were intended to benefit Plaintiffs and the Class members.

108.     Plaintiffs and the Class members reasonably relied on Defendant's ability to perform according to its obligations when they enrolled in the University.

109.    Defendant's obligations were material to Plaintiffs' and the Class members' decisions to enroll in the University because a reasonable person would have considered them to be important in deciding whether to enroll.

110.    Plaintiffs and the Class members paid tuition or tuition deposits to Defendant, declined employment and/or enrollment at other universities, and moved to Philadelphia in order to attend the University and obtain the benefits guaranteed under the contract.

111.    Defendant breached the contract when it failed to provide reasonable notice to students, faculty, and staff of its financial instability and impending closure.

112.    Defendant breached the contract when it failed to provide a clear transition plan, leaving students stranded, confused and abandoned, and placing the educational and career goals of Plaintiffs and the Class members in jeopardy.

113.    Defendant's breach of the contract directly injured Plaintiffs and the Class members, who spent considerable effort, time, and money to attend the University but are now forced to spend additional effort, time, and money to make alternate arrangements.

114.    Plaintiffs and the Class members paid tuition or tuition deposits, turned down other opportunities, and complied with all other obligations under the contract, but did not receive the promised benefits in return.

115.    Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and the Class members, thereby entitling Plaintiffs and the Class members to punitive damages.

116.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

**COUNT III**
**UNJUST ENRICHMENT**

**(on behalf of Plaintiffs and the Class)**

117.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

118.    This claim is brought in the alternative to Plaintiffs' contract-based claims.

119.    Plaintiffs and the Class members paid monies to Defendant.

120.    Defendant knowingly and willingly accepted and appreciated these benefits.

121.    Defendant's retention of these benefits would be inequitable because Defendant obtained benefits to the detriment of Plaintiffs and the Class members.

122.    Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and the Class members, thereby entitling Plaintiffs and the Class members to punitive damages.

123.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

<u>**COUNT IV**</u>
**COMMON LAW FRAUD**
**(on behalf of Plaintiffs and the Class)**

124.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

125.    Defendant sold various undergraduate and graduate degree programs.

126.    Defendant marketed that the University was a stable and reliable institution, able to remain financially stable and produce positive outcomes for its students, faculty, and staff, and that it would be open for the 2024-2025 academic year.

127.    Defendant sold degree programs with the knowledge that it would not provide said programs.

128.     Defendant knew that it was financially unstable and that it could not comply with state regulations or accreditation standards, and that it would close before the 2024-2025 academic year.

129.     Closure was foreseeable to Defendant, yet it failed to provide reasonable notice to students, faculty, and staff.

130.     Defendant intended that Plaintiffs and the Class members rely on its omissions and misrepresentations when enrolling in the University.

131.     Defendant induced Plaintiffs and the Class members to enroll in the University with knowledge that it would not provide degree programs to students, would not perform according to its obligations, remain financially stable, comply with state regulations and accreditations standards, produce positive outcomes for its students, faculty, and staff, or open for the 2024-2025 academic year.

132.     The facts misrepresented, concealed, and omitted by Defendant were material to Plaintiffs' and the Class members' decisions to enroll in the University because a reasonable person would have considered them to be important in deciding whether to enroll.

133.     Defendant knew or should have known that the facts misrepresented, concealed, and omitted were material to Plaintiffs and the Class members.

134.     Defendant had a duty to inform Plaintiffs and the Class members that it would not offer degree programs, that it was financially unstable, could not comply with state regulations or accreditation standards, and could not produce positive outcomes for its students, faculty, and staff because Defendant had superior knowledge of such circumstances, and Plaintiffs and the Class members could not have reasonably been expected to discover such circumstances through reasonable diligence before enrolling in the University.

135.    Plaintiffs and the Class members reasonably relied on Defendant's ability to perform according to its obligations when they enrolled in the University.

136.    Defendant failed to provide reasonable notice to students, faculty, and staff of its financial instability and impending closure.

137.    Defendant failed to provide a clear transition plan, leaving students stranded, confused, and abandoned, and placing the educational and career goals of Plaintiffs and the Class members in jeopardy.

138.    Defendant's misrepresentations and omissions directly injured Plaintiffs and the Class members, who spent considerable effort, time, and money to attend the University and are now forced to spend additional effort, time, and money to make alternate arrangements.

139.    Plaintiffs and the Class members paid tuition or tuition deposits, turned down other opportunities, and provided Defendant with other benefits, but did not receive the promised benefits in return.

140.    Had Plaintiffs and the Class members known of the facts misrepresented, concealed, and omitted by Defendant, they would not have enrolled in the University, or would have paid substantially less for tuition.

141.    Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and the Class members, thereby entitling Plaintiffs and the Class members to punitive damages.

## COUNT V
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
73 Pa. Stat. § 201-1, *et seq*.
(on behalf of Plaintiff Callaghan-Kenna and the Class, or Alternatively, the Pennsylvania Class)**

142.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

143.    Defendant offered and/or sold various educational degree programs for students to enroll.

144.    Defendant marketed that the University was a stable and reliable institution, able to remain financially stable and produce positive outcomes for its students, faculty, and staff, and that it would open for the 2024-2025 academic year.

145.    Defendant knew that it was financially unstable and that it could not comply with state regulations or accreditation standards.

146.    Defendant failed to provide educational degree programs and/or services to students.

147.    Closure was foreseeable to Defendant, yet it failed to provide reasonable notice to students, faculty, and staff.

148.    Defendant intended that Plaintiff Callaghan-Kenna and the Class members rely on its omissions and misrepresentations when enrolling in the University.

149.    Defendant induced Plaintiff Callaghan-Kenna and the Class members to enroll in the University with knowledge that it could not perform according to its obligations, remain financially stable, comply with state regulations and accreditations standards, or produce positive outcomes for its students, faculty, and staff, or open for the 2024-2025 academic year.

150.    The facts misrepresented, concealed, and omitted by Defendant were material to Plaintiff Callaghan-Kenna's and the Class members' decisions to enroll in the University because a reasonable person would have considered them to be important in deciding whether to enroll.

151.    Defendant knew or should have known that the facts misrepresented, concealed, and omitted were material to Plaintiff Callaghan-Kenna and the Class members.

152.    Defendant had a duty to inform Plaintiff Callaghan-Kenna and the Class members that it was financially unstable, could not comply with state regulations or accreditation standards, and could not produce positive outcomes for its students, faculty, and staff because Defendant had superior knowledge of such circumstances, and Plaintiff Callaghan-Kenna and the Class members could not have reasonably been expected to discover such circumstances through reasonable diligence before enrolling in the University.

153.    Plaintiff Callaghan-Kenna and the Class members reasonably relied on Defendant's ability to perform according to its obligations when they enrolled in the University.

154.    Defendant failed to provide reasonable notice to students, faculty, and staff of its financial instability and impending closure.

155.    Defendant failed to provide a clear transition plan, leaving students displaced, stranded, confused, and abandoned, and placing the educational and career goals of Plaintiff Callaghan-Kenna and the Class members in jeopardy.

156.    Defendant's misrepresentations and omissions directly injured Plaintiff Callaghan-Kenna and the Class members, who spent considerable effort, time, and money to attend the University and are now forced to spend additional effort, time, and money to make alternate arrangements.

157.    Plaintiff Callaghan-Kenna and the Class members paid tuition or tuition deposits, turned down other opportunities, and provided Defendant with other benefits, but did not receive the promised benefits in return.

158.    Had Plaintiff Callaghan-Kenna and the Class members known of the facts misrepresented, concealed, and omitted by Defendant, they would not have enrolled in the University, or would have paid substantially less for tuition.

159.    Defendant's conduct constitutes deceptive and unfair trade practices within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, et seq.

160.    Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiff Callaghan-Kenna and the Class members, thereby entitling Plaintiff and the Class members to punitive damages.

161.    As a direct and proximate result of Defendant's conduct, Plaintiff Callaghan-Kenna and Class members have been injured and sustained damages.

<u>**COUNT VI**</u>
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**
**Tex. Bus. & Com. Code § 17.01, *et seq.***
**(on behalf of Plaintiff Anderson and the Class, or Alternatively, the Texas Class)**

162.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

163.    Plaintiff Anderson and each member of the Texas Class is a "consumer" as defined in the Texas Deceptive Trade Practices Act ("DTPA").

164.    Defendant violated the following provisions of the DTPA: Tex. Bus. & Com. Code §17.50(1): the use or employment of a false, misleading, or deceptive acts or practices as defined in §17.46(b)(5), §17.46(b)(7), §17.46(b)(20), and §17.46(b)(24) of the DTPA that were detrimentally relied upon by Plaintiff Anderson and each member of the Texas Class; and Tex. Bus. & Com. Code §17.50(3): an unconscionable action or course of action as defined by §17.45(5).

165.    Defendant's violations of the DTPA were committed knowingly and intentionally as those terms are defined in §17.45(9) and §17.45(13) of the DTPA.

166.    Defendant's conduct was a producing and/or proximate cause of actual damages to Plaintiff Anderson and each member of the Texas Class.

167.    Plaintiff Anderson and Texas Class members demand judgment against Defendant for compensatory damages in an amount to be determined at trial. Plaintiff Anderson and Texas Class members will seek treble damages for the intentional and knowing conduct of Defendant, together with reasonable attorneys' fees and costs.

168.    Plaintiff Anderson provided notice to Defendant pursuant to the Texas DTPA on June 12, 2024.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.  Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.  Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C.  Award actual damages and equitable monetary relief to Plaintiffs and the Class;

D.  Award pre-judgment and post-judgment interest on such monetary relief;

E.  Grant appropriate injunctive and/or declaratory relief;

F.  Award reasonable attorneys' fees and costs; and

G.  Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.


Dated: June 12, 2024

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Joseph G. Sauder*
Joseph G. Sauder
Joseph B. Kenney
Juliette T. Mogenson
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: (888) 711-9975
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
jbk@sstriallawyers.com
jmt@sstriallawyers.com

*Attorneys for Plaintiffs*

</div>